No. 23-12101

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT
_____

UNITED STATES OF AMERICA,
*Appellee,*

v.

ABDOULAYE BARRY,
*Appellant.*

---

On appeal from the United States District Court
For the Northern District of Georgia
No. 1:21-cr-385-ELR-CCB

---

BRIEF OF APPELLANT ABDOULAYE BARRY

---

Lynsey M. Barron
BARRON LAW LLC
1800 Peachtree Rd. NE
Suite 300
Atlanta, GA 30309
(404) 276-3261

*Counsel for Appellant*
*Abdoulaye Barry*

*U.S. v. Abdoulaye Barry*

No. 23-12101

## Certificate of Interested Persons

Pursuant to Fed. R. App. P. 26.1 and Eleventh Circuit Rule 26.1-1 to 26.1-3, Appellant states that the following people and entities have an interest in the outcome of this appeal:

1. Anand, Hon. Justin A., United States Magistrate Judge

2. Barron, Lynsey M., Counsel for Appellant

3. Capital One Bank (COF), Victim

4. Comerica Bank (CMA), Victim

5. Connors, Kelly K., Assistant United States Attorney

6. Cooper, Natasha S., Assistant United States Attorney

7. Buchanan, Ryan K., United States Attorney

8. Erskine, Kurt R., Former United States Attorney

9. Ross, Hon. Eleanor L., United States District Judge

10. Secret, Akil, Former Counsel for Appellant

11. Sommerfeld, Lawrence R., Assistant United States Attorney

12. Synchrony Bank (SYF), Victim

13. United States of America, Appellee

14. U.S. Bank (USB), Victim

15. Vineyard, Hon. Russell G., United States Magistrate Judge

*U.S. v. ABDOULAYE BARRY*
NO. 23-12101

16. Wal-Mart Inc. (WMT), Victim

The Appellant is currently incarcerated.

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument is necessary because this case involves novel questions of law.

# TABLE OF CONTENTS

Certificate of Interested Persons ........................................................ C-1 OF 1

Statement Regarding Oral Argument ...................................................... II

Statement of Jurisdiction ...................................................................... VI

Statement of the Issues ........................................................................ 1

Statement of the Case .......................................................................... 2

    I.      Appellant's Trial ........................................................................ 2

    II.    Sentencing Hearing.................................................................. 6

    III.   Standard of Review............................................................... 13

Summary of the Argument ................................................................. 14

Argument ........................................................................................... 16

    I.     The District Court Committed Procedural Error by Calculating the Loss Amount to Include Losses Caused by Appellant's Codefendants; for Relying on Incorrect Legal Assumptions to Base Its Loss Finding; and for Failing to Adequately Consider the Mandate to Avoid Unwarranted Sentencing Disparities...........................................................................16

        A.  The District Court Incorrectly Calculated the Applicable Loss Amount by Including Losses Caused by Codefendants as Relevant Conduct............................................................................17

        B.  The District Court Erred by Failing to Articulate the Evidence Supporting Its Decision to Hold Appellant Accountable for the Losses Sustained by Others, Making Its Decision Virtually Unreviewable............................................................................26

C. The District Court Failed to Give Proper Weight to a § 3553(a) Factor—the Need to Avoid Unwarranted Sentencing Disparities.......29

II.    The District Court Erred in Ordering Appellant to Pay $539,121.79 in Restitution...................................................................................34

Conclusion .................................................................................. 37

Certificate of Compliance ........................................................... 377

Certificate of Service .................................................................. 388

## TABLE OF AUTHORITIES

PAGE(S)

**Cases**

*Gall v. United States,*
    552 U.S. 38 (2007) ........................................................................13, 16

*Kotteakos v. United States,*
    328 U.S. 750 (1946) ..............................................................................19

*United States v. Chandler,*
    388 F.3d 796 (11th Cir. 2004) ................................................. 18, 19, 22

*United States v. Chastain,*
    198 F.3d 1338 (1st Cir. 1999) ...............................................................18

*United States v. Crosby,*
    No. 23-10283 (11th Cir. Jan. 3, 2024) ..................................................29

*United States v. Gonzalez,*
    550 F.3d 1319 (11th Cir. 2008) .......................................................16, 33

*United States v. Gosha,*
    772 F. App'x 833 (11th Cir. 2019)........................................................26

*United States v. Hunter,*
    323 F.3d 1314 (11th Cir. 2003)........................................................26, 38

*United States v. Huff,*
    609 F.3d 1240 (11th Cir. 2010) .......................................................13, 23

*United States v. Irey,*
    612 F.3d 1160 (11th Cir. 2010) .............................................................16

*United States v. McCrimmon,*
    362 F.3d 725 (11th Cir. 2004) ...............................................................17

*United States v. Medina,*
    485 F.3d 1291 (11th Cir. 2007) .....................................................*passim*

*United States v. Nelson,*
    301 F. App'x 894 (11th Cir. 2008)........................................................18

*United States v. Perez,*
    489 F.2d 51 (5th Cir. 1973) ....................................................... 19, 23, 24

*United States v.Richardson,*
    532 F.3d 1279 (11th Cir. 2008)..............................................................24

iv

*United States v. Seher*,
  562 F.3d 1344 (11th Cir. 2009) ..................................................23, 24
*United States v. Sheffield*,
  939 F.3d 1274 (11th Cir. 2019) ........................................................ 34


## <u>Statutes</u>

18 U.S.C. § 1028A ......................................................................... 2, 32
18 U.S.C. § 1029 ........................................................................... 2, 32
18 U.S.C. § 3553(a) ....................................................................... *passim*
18 U.S.C. § 3663A .............................................................................. 34
28 U.S.C. § 1291 ................................................................................ vi

## <u>Rules</u>

Eleventh Circuit Rule 32-4 ................................................................ 37
Eleventh Circuit Rule 26.1 to 26.3 .................................................... C1
Fed. R. App. P. 4(b)(1)(A)(i) ............................................................ vi
Fed. R. App. P. 26.1 .......................................................................... C1
Fed. R. App. P. 32 ............................................................................. 37
USSG § 1B1.3 ............................................................... 10, 17, 28, 32
USSG § 2B1.1 .................................................................................... 26
USSG § 3E1.1 .................................................................................... 31
USSG § 5K2.0(d)(2) ..................................................................... 31, 32

## STATEMENT OF JURISDICTION

This Court has jurisdiction over Appellant's appeal. On June 26, 2023, the district court entered final judgment, which disposed of all claims and was appealable under 28 U.S.C. § 1291. (*See* Case No. 1:21-cr-385-ELR-JSA, Dkt. 234.) Appellant filed a timely Notice of Appeal that same day. (Dkt. 235.); *see* FED. R. APP. P. 4(b)(1)(A)(i).

## STATEMENT OF THE ISSUES

(1)    Did the district court err in holding Appellant responsible for the loss amounts sustained by his coconspirators, when the government did not prove that their losses were reasonably foreseeable to him, thereby committing procedural error?

(2)    Did the district court articulate a sufficient basis to support its factual finding that Appellant should be held accountable for the acts of others, or did it instead rely on erroneous legal assumptions to support its factual finding?

(3)    Did the district court fail to give adequate weight to the need to avoid unwarranted sentencing disparities when it held Appellant responsible for the loss of his codefendants but did not hold any of them responsible for the acts of others in a jointly undertaken activity, especially where Appellant's direct loss amount was significantly less than that incurred by his codefendants?

(4)    Did the district court err in requiring defendant alone to pay restitution for the entire conspiracy, while his codefendants were only ordered to pay restitution for the losses they individually caused?

1

<u>S</u><u>TATEMENT OF THE</u> <u>C</u><u>ASE</u>

I.   <u>Appellant's Trial</u>

Appellant Abdoulaye Barry was indicted for his role in a scheme to use false identification information and stolen credit cards to purchase cigarettes at Sam's Club stores in the Atlanta, Georgia area. (Dkt. 1.) He was charged with Conspiracy to Commit Access Device Fraud in violation of 18 U.S.C. § 1029(b)(2); six substantive counts of Access Device Fraud in violation of 18 U.S.C. § 1029(a)(2); and six counts of Aggravated Identity Theft in violation of 18 U.S.C. §§ 1028A(a)(1) and 2, each of which corresponded to a substantive charge of access device fraud. (*Id.*) Of the six individuals charged, he alone exercised his right to hold the government to its burden. After a jury trial, the district court directed verdict in Appellant's favor on one substantive count of access device fraud and the corresponding aggravated identity theft count. (Dkt. 251 at 580.) The jury acquitted him of one more access device fraud count and the corresponding aggravated identity theft count, and it convicted him of the remaining counts including the conspiracy charge. (Dkt. 194.)

The following facts relevant to this appeal were shown at trial. Appellant lawfully emigrated to the United States in August 2017 from Conakry, Guinea. (Presentence Investigation Report ("PSR") ¶ 79.) He was raised primarily in the rural village of Timbo before moving to the capital Conakry for high school. (*Id.* ¶¶ 77, 79.)

2

His family had no Internet, computer, or television; indeed, they did not even have electricity. (Dkt. 251 at 587.) Growing up, Appellant had no exposure to a sophisticated financial system or even the concept of a bank account; instead, his family kept all of its money in a box on a table. (*Id.* at 585-86.) He was 21 years old before he even laid eyes on a credit card. (*Id.* at 586.) When Appellant was 19 years old, he joined his mother in the United States, although he spoke very little English. (*Id.* at 590.) He began taking English lessons and got his GED, and he planned to join the Marines. (*Id.* at 590-91.)

About a year after he emigrated to the United States, Appellant was hanging out at a club with some friends and met a man who approached him who said he was in the business of selling cigarettes. (*Id.* at 593-96.) The man, who Appellant recognized as also being of West African descent, introduced himself as "John," although Appellant knew that was likely not his name but rather an Americanized version of his African name. (*Id.* at 597.) John offered the Appellant a job buying cigarettes at Sam's Club stores. (*Id.* at 598-99.)

In reality, John was recruiting Appellant into a scheme to use fraudulent Sam's Club memberships and stolen credit card information to purchase large quantities of cigarettes. It was never in dispute that Appellant used fraudulent Sam's Club memberships and unauthorized credit cards to purchase cigarettes as part of the

scheme. Indeed, Appellant testified to his involvement, including how he was recruited and exactly what he would do at each transaction. What Appellant disputed was whether he knew the credit cards were unauthorized and whether the means of identification (which the government alleged to be those same credit cards) belonged to real people.

Appellant testified to his involvement, including how he was recruited and exactly what he would do at each transaction.[1] After Appellant agreed to work for John, John took a picture of Appellant and used it to create fake identification documents that bore Appellant's likeness but other names. (Dkt. 251 at 601.) John also gave Appellant business documents regarding a business that Appellant believed to be John's business but that were also fake, along with a credit card that Appellant believed was actually John's card, and directed Appellant to open a membership at Sam's Club with the documents. (*Id.* at 602-03.) Appellant did not know anything

_____

[1] The government may argue that Appellant's explanation of how the fraud worked comes from his self-serving testimony at trial, but the government never called any witness to rebut it and did not offer any evidence that contradicts Appellant's account. And as explained below, the district court did not levy an adjustment for obstructing justice at sentencing based on Appellant's testimony, suggesting that the district court did not find him to lack credibility. Importantly, at sentencing, Appellant presented a memorandum of interview the government conducted with a codefendant—whom Appellant does not even know—who described his interactions with the hub conspirator and his engagement in the transactions virtually identically to Appellant's testimony.

about Sam's Club or how membership warehouses work, and he followed John's direction. (*Id.* at 603-04.) Appellant admitted that he opened a Sam's Club membership in a name that was not his. (*Id.* at 604.) He did not believe any of the names belonged to real people and indeed, the government never proved that the names he used *did* belong to real people. For example, one of the membership cards said "Baud Mathis," which was never proven to be a real person. (*See id.* at 605-06.) He thought they were just opening accounts in fake names. (*Id.* at 606.)

At John's direction, Appellant used the Sam's Club memberships and credit cards he was handed by John to buy cigarettes. (*Id.* at 605.) After the purchases, Appellant returned the cigarettes and the membership cards and credit cards to John; he was never allowed to keep them. (*Id.* at 606-07.) Appellant had no reason to believe that the credit cards belonged to real people other than John. (*Id.* at 608.) At some point, Appellant became suspicious that something about the cigarette buying was not right, and he stopped working for John. (*Id.* at 611-12.)

Appellant never worked with or saw anyone other than the man he knew as John participating in this scheme, and he does not know any of the other individuals indicted with him as part of the alleged conspiracy. (*Id.* at 612-13.) The government never called any witness to rebut that fact and did not offer any evidence that contradicts Appellant's account that he worked exclusively with John and had no

reason to think that anyone other than he and John were involved in the scheme. Even though Appellant's five codefendants had all pled guilty prior to his trial, not one of them was brought in to testify to his participation in the scheme or even to identify him as a participant even though they all would have had an incentive to earn credit for cooperation if there was anything helpful to the government they could possibly say about Appellant. Appellant testified on his own behalf. (*Id.* at 583.)

## II. <u>Sentencing Hearing</u>

The Probation Officer prepared a Presentence Investigation Report that yielded a custody Guidelines range of 41-51 months' imprisonment on the conspiracy and substantive counts of access device fraud, and a range of 24 to 96 months' imprisonment on top of that depending on whether the district court chose to run the aggravated identity theft charges consecutive to each other or concurrent to each other and only consecutive to the underlying fraud counts. (PSR at p. 35.) The PSR recommended a base offense level of 6 and a 12-level enhancement for loss amount, including not only the loss sustained by Appellant but also all of his codefendants. (PSR ¶ 51.) Appellant objected, arguing that this was a "hub and spoke" conspiracy and that he should only be held accountable for his own loss and his conspiracy directly with John, since the involvement of the other defendants was not reasonably foreseeable to him. (*Id.*) This would have yielded an 8-level loss increase instead of the 12-level

increase recommended by the PSR. (*Id.*) The government also objected to the PSR's failure to include the loss associated with counts for which Appellant was acquitted. (*Id.*)

The PSR also recommended, over Appellant's objection, a 2-level enhancement because the offense involved more than 10 victims. (PSR ¶ 52.) Although the initial PSR did not recommend an enhancement for obstruction of justice based on Appellant's trial testimony, the final PSR incorporated the government's request for such enhancement but noted that Appellant's objection to this enhancement was preserved. (PSR ¶ 55.) At sentencing, the district court sustained Appellant's objection to both of these enhancements. (*See* Dkt. 253 at 50-51.)

Regarding the loss amount, the key question was whether Appellant should be held accountable for just the loss associated with his conduct in his conspiracy with John or whether the reasonably foreseeable loss included the conduct of others charged in the conspiracy. The government sought to hold him accountable for $567,933.53, which included Appellant's conduct and the loss caused by his codefendants. (*See id.* at 11.) Appellant argued that, although the government charged a conspiracy involving him and several others, the evidence at trial proved a "hub and spoke" conspiracy instead, where he worked directly with a "hub" conspirator but had no knowledge of that hub's independent dealings with other conspirators. (*Id.* at 25.)

7

There was no interdependence between him and the other spokes of the wheel, as required by this Circuit's law. (*Id.*) As a result, he argued that he should only be held responsible for the loss amount attributable to his conduct—$117,261.98. (*Id.* at 22.)

The government's evidence of interdependence consisted of two sets of facts: First, it relied on the testimony of the manager of a local Sam's Club who testified that, to get added to a Sam's Club membership account, an individual would have to go into the store with the primary account holder. (*Id.* at 13.) From this, the government asked the court to deduce that Appellant would have had to be in the Sam's Club with someone else when he was either added to an existing account or when someone else was added to an account he was using. (*See id.*) For example, Appellant was added as a secondary member to two existing accounts, so he would have had to go in with the primary account holder to get added. (*Id.* at 13-14.) This proved that Appellant "was aware that there were other individuals that he was working with to accomplish this scheme." (*Id.* at 14.) But this testimony was completely consistent with Appellant's testimony about how he worked with the man he knew as John to open the accounts. The government was never able to identify who these other people were and whether they were the other defendants whose loss was being attributed to Appellant. Of course Appellant was working with someone else—he never denied that. But there was absolutely no evidence from which the government could argue, or the

8

court could conclude, that the other person who went inside the Sam's Club with Appellant was the hub conspirator (John) or another spoke.

Second, the government relied on what it called a "pattern" of conspirators were using the same memberships and, at times, the same credit cards and were thus passing the cards back-and-forth. (*See id.* at 15-16.) Appellant never disputed that others may have used the same memberships and cards as him, but he testified (and the government never disputed) that after each purchase, he would give the cards back to the person he knew as John. There was no evidence that Appellant would or should have known what John did with them or to whom John gave them after Appellant's purchase was complete.

To corroborate Appellant's testimony from trial that he never dealt with anyone except John and did not know what happened to the cards after he was done, Appellant presented a memorandum of interview the government conducted with a codefendant—whom Appellant does not even know—who described his interactions with the hub conspirator and his engagement in the transactions virtually identically to Appellant's testimony. (*Id.* at 25-26.) He also pointed out that while the conspirators were using some of the same cards, they were never using them on the same day or in the same location. (*Id.* at 27.) And in the hours and hours of surveillance footage the government obtained, reviewed, and produced, there was not one photograph of

Appellant anywhere near anyone else identified as a conspirator in this case. (*See id.*) Appellant agreed with the government that there absolutely was a "pattern," but the pattern was a classic hub-and-spoke conspiracy: They are all doing the same thing. And they are doing it in the same way. But they are not doing it with each other. They are doing it directly with the hub. And that's why it was not reasonably foreseeable to my client that [the other defendants] were all doing the exact same thing." (*Id.* at 30.)

Finally, Appellant pointed to the government's inconsistence regarding loss. Appellant was the only defendant who exercised his constitutional right to a jury trial, and he was the only defendant the government tried to tag with the loss amount from the entire conspiracy. (*Id.* at 31.) At the sentencings for the other defendants, the government argued and the court found that the loss amount for each was only the conduct directly attributable to them. (*Id.* at 31.) Undersigned counsel contacted the government prior to sentencing regarding its inconsistent position to see if the matter could be resolved by agreement, but the government took the position that the Appellant went to trial and was found guilty of conspiracy whereas the others only pled guilty to substantive counts of access device fraud and identity theft. (*Id.* at 32.) As argued below and as the government knows, of course, relevant conduct is relevant conduct regardless of whether a defendant is found guilty of or even charged with conspiracy. *See* USSG § 1B1.3, cmt. n. 3(A).

10

The court characterized the government's inconsistent position as an acceptable plea negotiation tactic: "[Y]ou would agree, though, that the government is entitled to consider certain things in negotiating a plea that they might not give a defendant the benefit of if he goes to trial. It's not necessarily a trial punishment, but that's just one of the negotiation tools is, okay, we'll only attribute this to you instead of everything else, although we could if we wanted to." (Dkt. 253 at 32.) Appellant pointed out that the government had made the same offer to him, to limit his loss to his direct conduct. "But the Guidelines exist for a reason. They are to create consistency and to make sure that people are treated fairly under the law as a matter of due process. He's getting penalized for going to trial. He's getting thee acceptance of responsibility taken from him. . . . He's going to pay a price for exercising his constitutional right to go to trial." (*Id.* at 33.) "For the government to then say, well, you know what, you made us do all this work, so we are going to try and take your, what would have been a level eight, bump it up to a 14, even though we had all the same evidence at the same time that we sentenced everyone else and could have asked for that, we didn't with them because they saved us the trouble. That's a due process argument. That's a real due process problem, your honor." (*Id.* at 33.) He further argued that punishing appellant for going to trial creates a sentencing disparity that is not supported under 18 U.S.C. § 3553(a). (*Id.*) The Guidelines allow for credit for accepting responsibility to incentivize

11

people to plead guilty and save resources, "but you don't tinker with the application of the law to the facts just because a man went to trial. It's either relevant conduct or it's not." (*Id.*)

The district court overruled Appellant's objection to the extent that the PSR held him accountable for the conduct of others. (*Id.* at 34.) The court did not address Appellant's hub-and-spoke argument or his reasonable foreseeability argument; it simply stated that "I do find that the government did prove a conspiracy existed and the jury obviously did agree to that." (*Id.*) The court's final Guidelines calculations resulted in an advisory range of 21 to 27 months' imprisonment, plus up to 24 months consecutive for each of the four counts of aggravated identity theft. (*Id.* at 76.) The court sentenced the defendant to 69 months' imprisonment total, which was 21 months on the access device charges plus 48 months for the aggravated identity theft charges (two of which ran consecutive to each other and to the 21 months, and the other two of which ran concurrent to the 48 months). (*Id.* at 76-77.) The court awarded restitution in the amount of $539,131.79—consistent with its loss findings—by separate order. (Dkt. 247.)

Appellant is currently incarcerated.

12

### III.   <u>Standard of Review</u>

- Whether a defendant should be held accountable for the loss amount incurred by a co-defendant is a question of law that this Court reviews *de novo*; factual findings regarding loss are reviewed for clear error. *See United States v. Huff*, 609 F.3d 1240, 45 (11th Cir. 2010). This Court otherwise reviews the reasonableness of a sentence for abuse of discretion. *Gall v. United States*, 552 U.S. 38, 51 (2007).

- This Court reviews the legality of a restitution order *de novo. See United States v. Huff*, 609 F.3d 1240, 1247 (11th Cir. 2010).

13

## SUMMARY OF THE ARGUMENT

Appellant was charged with and convicted of participating in a conspiracy to use unauthorized credit cards to obtain cigarettes from Sam's Club. Appellant never disputed that he worked directly with one individual, but the government failed to prove that he knowingly entered a conspiracy involving his five codefendants. Indeed, the government's evidence proved a classic hub-and-spoke conspiracy where there is a primary conspirator organizing the activities of others, who act independently of each other and without the knowledge that the others even exist.

Because the government only proved a hub-and-spoke conspiracy, it was error for the district court to hold Appellant accountable for the losses sustained by other spokes, both in calculating his Guidelines range and in determining the amount he should pay in restitution. The district court further erred in not explaining the extraordinary discrepancy between how it fashioned loss and restitution for Appellant as compared to his codefendants, each of whom only had to account for the losses they personally sustained, and why this disparate treatment is justified under existing law. The record makes clear that, in calculating the Guidelines range. both the government and the district court imposed an additional trial penalty on Appellant beyond that authorized in the Guidelines, treating him differently for loss calculations

14

solely because he went to trial. This was error, and this Court should reverse and remand for resentencing.

<u>ARGUMENT</u>

I.  <u>The District Court Committed Procedural Error by Calculating the Loss Amount to Included Losses Caused by Appellant's Codefendants; for Relying on Incorrect Legal Assumptions to Base Its Loss Finding; and for Failing to Adequately Consider the Mandate to Avoid Unwarranted Sentencing Disparities.</u>

In reviewing a federal sentence, this Court examines whether it is both procedurally and substantively reasonable, setting aside those sentences that are not reasonable. *United States v. Irey*, 612 F.3d 1160, 1165, 1193 (11th Cir. 2010). A district court commits procedural error if it fails to calculate the applicable Guidelines range properly or fails to consider appropriate statutory factors under 18 U.S.C. § 3553(a). *Gall v. United States*, 552 U.S. 38, 51 (2007); *see also United States v. Gonzalez*, 550 F.3d 1319, 1323 (11th Cir. 2008). A district court can abuse its discretion by considering the proper factors but balancing them unreasonably. *Irey*, 612 F.3d at 1193. The court may not speculate as to whether a fact exists that would result in a higher Guideline range. *United States v. Medina*, 485 F.3d 1291, 1304 (11th Cir. 2007). The government has the burden of demonstrating the loss amount by a preponderance of "reliable and specific" evidence. *Id.* (citation and internal quotation marks omitted).

Here, the district court increased Appellant's loss amount and held him accountable for the acts of his codefendants without a sufficient factual basis to conclude that their conduct was within the scope of the conspiracy he agreed to join or that

16

their conduct was reasonably foreseeable to him. On the contrary, the record at sentencing makes clear that the district court held him accountable for a higher loss amount than his codefendants—each of whom had only been held responsible for their own losses without including as relevant conduct losses incurred by others—solely because he went to trial, which is not authorized under the Guidelines. Nor did the court justify this unwarranted sentencing disparity as required by statute. This created reversible error.

A.  <u>The District Court Incorrectly Calculated the Applicable Loss Amount by Including Losses Caused by Codefendants as Relevant Conduct.</u>

Before a defendant can be held accountable for loss amounts sustained by others in a conspiracy beyond that he directly caused himself, it must first show that the additional loss was committed as part of and in furtherance of a jointly undertaken criminal activity and that such loss was reasonably foreseeable to the defendant. *See* USSG § 1B1.3(a)(1)(B); *see also United States v. McCrimmon*, 362 F.3d 725, 731 (11th Cir. 2004). The scope of "jointly undertaken criminal activity" is not necessarily coextensive with the charged conspiracy. *See* USSG § 1B1.3 cmt. n. 3(B). The district court must first determine the scope of the criminal activity in which a defendant agreed to participate and then determine whether the acts of others were within the scope of his agreement. *Id.* Here, there was insufficient evidence that the acts of other

17

defendants were within the scope of the conspiracy Appellant joined or that their acts were reasonably foreseeable to him.

The government charged a broad conspiracy among six individuals, but Appellant argued at sentencing that it only proved only a rimless "hub and spoke" conspiracy rather than a single conspiracy. In deciding whether the government proved a single conspiracy or multiple conspiracies, this Court looks at three factors (1) whether there was a common goal; (2) the nature of the underlying scheme; and (3) the overlap of participants. *See United States v. Nelson*, 301 F. App'x 894, 897 (11th Cir. 2008) (citing *United States v. Chastain*, 198 F.3d 1338, 1349 (11th Cir. 1999)). Where a defendant's actions facilitated the actions of others or the "venture as a whole," then there is sufficient proof of a single conspiracy. *Id.* at 898.

A "hub-and-spoke" conspiracy, by contrast, exists where there is a single core who recruits one or more other conspirators to carry out various parts of the scheme. *See United States v. Chandler*, 388 F.3d 796, 807 (11th Cir. 2004). The core conspirator, or hub, "move[s] from spoke to spoke, directing the functions of the conspiracy." *Id.* Where the spokes deal directly and independently with the hub conspirator and have no knowledge of or connection with each other, there are "as many conspiracies as there are spokes." *Id.* at 808. This type of conspiracy is like a "'rimless wheel' because there is not rim to connect the spokes into a single scheme." *Id.* (quoting *Kotteakos v.*

18

*United States*, 328 U.S. 750, 755 (1946)). Such conspiracy lacks the "interdependence among the alleged co-conspirators" necessary to prove a single conspiracy." Id. at 811.

Appellant understands that, by its nature, a conspiracy "tends to be secret" and "the agreement is seldom susceptible of direct proof." *United States v. Perez*, 489 F.2d 51, 61 (5th Cir. 1973). For this reason, an overarching conspiracy is usually proved in one of three ways: (1) by circumstantial evidence; (2) by the testimony of a co-conspirator who has chosen to cooperate; or (3) by out-of-court statements of a co-conspirator (under the co-conspirator admissions rule) or by the defendant himself. *Id.* "If the totality of these types of evidence is adequate to show a concert of action, all the parties working together understandingly, with a single design for the accomplishment of a common purpose then the conspiracy may be found. . . . This is not to be confused with situations where separate conspiracies exist and certain parties are common to each." *Id.* at 61-62.

Here, the second two categories of evidence were not present. There was no cooperating co-conspirator, nor were there any nonhearsay admissions from Appellant or his alleged coconspirators. The government relied solely on the first category – circumstantial evidence – to prove the existence of the conspiracy. This evidence fell into two buckets, as described in the factual recitation above. First, the government relied on testimony from Alan Mehic, the manager of a local Sam's Club, who explained

19

that generally customers can only get added to a Sam's Club membership account by accompanying the primary account holder. (*See* Dkt. 253 at 13.) The government's argument here was that Appellant must have gone into the Sam's Club with someone else to be added to the memberships he used and that he would have had to be present with others who were presumably added to the one account in which he was the primary accountholder. (*See id.* at 13-14 (which presumably proved that Appellant "was aware that there were other individuals that he was working with to accomplish this scheme").) But in the voluminous surveillance the government produced and exhibited at trial, it did not have a single video or photograph of Appellant actually in a Sam's Club with anyone else. Further, Mehic's testimony is not inconsistent with Appellant's testimony, that he worked with another person he knew to be John.

What the government failed to prove—and what is not a reasonable inference from the circumstantial evidence—is that he was added to memberships while any of his five codefendants were present, or that they were added to his in his presence. There was no historical cell site data, for example, to show that any of the defendants were ever in the same place at the same time. Indeed, there was no evidence presented that they were even engaging in transactions on the same day at the same time in the same place.

20

Even if this Court concludes that Appellant would have reasonably foreseen purchases by people on the same Sam's Club accounts as him because they would have shown up in person together to apply for memberships, this logic does not carry through to the use by conspirators of the same credit cards. For example, in late October 2019, seven purchases totaling $73,562.01 were made using Comerica card ending in x6165, which belonged to victim D.C. (PSR ¶ 27.) But these purchases were made using Sam's Club membership accounts that were never associated with Appellant. Indeed, those purchases were made on October 25, 26, and 27, 2019—days when Appellant was not buying cigarettes at all. (*Compare* PSR ¶ 25 *with* PSR ¶ 27.) Similarly, this same chart lists three transactions totaling $34,905.10 on November 5, 2019 using two cards Appellant had used on a different day but with memberships the government never proved he never used. (*Id.*) There was no evidence presented that Appellant would have reason to know people using these other memberships would be using credit cards he had previously used, and why those losses were reasonably foreseeable to him.

The second bucket of circumstantial evidence on which the government relied to show that Appellant should have reasonably foreseen that his codefendants were committing fraud was what it called a "pattern" where the coconspirators would use the same memberships and credit cards at time, implying that they were passing the

21

documents back and forth and must have known about each other. (*See* Dkt. 253 at 15-16.) It is not disputed that there were others using the same membership documents and credit cards, the only evidence *at all* on how these cards were passed around came from Appellant, who told the jury that he would return the cards to John after he made his purchases. He had no way of knowing that John would then turn around and give the cards to someone else, and there was no circumstantial evidence that would even support that inference. Nor is the fact that Appellant may have participated in a fraud scheme and may have made misrepresentations as part of that scheme is not enough to prove that he agreed to a larger conspiracy with individuals unknown to him. *See Chandler*, 388 F.3d at 809-10 ("[I]ndividual and independent misrepresentations do not permit an inference of knowledge of and agreement to join the overall scheme. If the defendants have no knowledge of the overall conspiracy, their independent, even fraudulent misrepresentations do not supply that link.").

The fact that the government could never place two coconspirators even in the same geolocation—much less the same Sam's Club—at the same time is odd. As stated above, there was ample video evidence of all the transactions, but the government never tied Appellant's transactions in time or space to any of his codefendants. Nor did the government call a single witness who had ever laid eyes on Appellant—much less who could testify that they committed crimes with him—which again is odd since

*all* of the other defendants had entered negotiated plea agreements by the time Appellant went to trial. Not one was brought in to identify Appellant. Even if the various spokes had a common aim—which it appears they did—there was no evidence that they were aware of each other and that others shared that aim. *See United States v. Seher*, 562 F.3d 1344, 1367 (11th Cir. 2009); *see also United States v. Huff*, 609 F.3d 1240, 1243-44 (11th Cir. 2010).

While courts are forgiving in allowing circumstantial evidence to prove the existence of a conspiracy, the government must nonetheless be more meticulous in its proof than it was here. There simply was **_no_** evidence from which a reasonable inference could be drawn that it was reasonably foreseeable to Appellant that there were other individuals purchasing cigarettes either as part of the scheme or using the same memberships and cards he was using.

Contrast this case with *Perez*, where the former Fifth Circuit concluded that an overarching conspiracy existed where the success of any individual conspirator necessarily depended on the actions of other conspirators, as opposed to "'one shot' efforts." *Perez*, 489 F.2d at 62-63. While there were several repetitions of the scheme constituting separate incidents of fraud, there were not multiple conspiracies but rather one overarching scheme because, while iterative, there was "careful planning and cooperation" by each of the co-conspirators that was necessary to the overall success

23

of the scheme. *Id.* at 63. It was "not a series of little concoctions to set up a particular collision. It was rather a grand scheme for all to obtain some reward for his/her participation each according to the part played and the risk undertaken." *Id.* at 64. Here, the success of each individual defendant in using the unauthorized credit cards to buy cigarettes was not dependent on Appellant's actions.

Contrast this case also with *United States v. Richardson*, in which this Court rejected the defendant's claim that there were multiple drug conspiracies instead of one because there were multiple drug deals involving various individuals. *See United States v. Richardson*, 532 F.3d 1279, 1285-86 (11th Cir. 2008). In *Richardson*, this Court acknowledged that there were different groups engaging in different transactions, but the defendant "almost always played a central role." *Id.* at 1285. He was a key figure in the conspiracy who directed the activities and efforts of various others, and thus "knowingly involved himself with each conspiratorial act" that others did. *Id.* at 1286; *see also id.* at 1288 (concluding that the defendant was not a spoke, as he had argued, "but the hub of all the conspiratorial acts the government sought to prove at trial"). Similarly, in *Seher*, this Court rejected a "hub and spoke" defense theory where drug dealers were purchasing product from the defendant and were aware that other drug dealers were also purchasing product from him, and thus his "co-conspirators were aware of the nature and scope" of his scheme. *Seher*, 562 F.3d at 1367-68.

24

The government may claim that the jury must have found him responsible for the entire conspiracy because it convicted him of the conspiracy count, but the jury's verdict, taken as a whole, actually suggests the opposite. The jury acquitted Appellant of the counts of conviction involving alleged victim S.M. even though he was charged with acting as a principle and with aiding and abetting, which means he could have been convicted if the theft occurred even if he was not one involved directly in the theft. To prove these counts, the government called a representative of the financial institution issuing the credit card that was used and the victim herself. (Dkt. 250 at 363, 377.) Appellant's counsel pointed out, however, that the surveillance footage of the individual who the government alleged engaged in that transaction was not even Appellant. (*See* Dkt. 252 at 719-22, 742.) Presumably the jury agreed with Appellant's counsel and voted to acquit him of these counts not because the government failed to prove that the transaction was fraudulent but because it failed to prove that Appellant was involved. The jury clearly did not find the evidence sufficient to hold Appellant responsible for the conduct of another individual—whomever actually used S.M.'s card on this occasion—even though that person was acting in furtherance of the larger scheme.

There was no evidence of a single conspiracy tying the separate spokes together— as evidenced by Appellant's acquittal of two counts for which he could have been

convicted had the jury found he had aided and abetted those crimes—and the district court should only have held Appellant responsible for the loss attributable to the conspiracy between him and the man who provided him with the cards to use and for whom he was buying the cigarettes, which was $117,261.98. (PSR ¶ 25.) This would have yielded a fraud-loss enhancement of 8 levels, rather than the 12 levels the district court applied. *See* U.S.S.G. § 2B1.1(b)(1). Because Appellant's guidelines were incorrectly calculated, his sentence is procedurally unreasonable and must be reversed and remanded.

B. **The District Court Erred by Failing to Articulate the Evidence Supporting Its Decision to Hold Appellant Accountable for the Losses Sustained by Others, Making Its Decision Virtually Unreviewable.**

This Court has made clear that a district court commits reversible error when it fails to make individualized findings to support its loss rulings, including the scope of the jointly-undertaken activity and the scale of the its reasonable foreseeability. *See Medina*, 485 F.3d at 1304-05; *see also United States v. Hunter*, 323 F.3d 1314, 1320-21 (11th Cir. 2003); *United States v. Gosha*, 772 F. App'x 833, 834 (11th Cir. 2019). This Court cannot conduct a meaningful review when the district court simply makes a finding that the evidence is sufficient but does not explain what "reliable and specific evidence it used to calculate the loss amount." *See Medina*, 485 F.3d at 1304.

26

In *Medina*, this Court reversed the defendant's sentence when the district court's reasoning was generic: "With regard to the loss amounts for which each of the defendants is to be held accountable those are my findings." *Id.* Here, the district court did not point to any evidence supporting its finding that Appellant should be attributed the loss associated with other defendants. In overruling Appellant's objection to the PSR on the basis that he should only be held accountable for his own conduct, the court found "that the government did prove a conspiracy existed and the jury obviously did agree to that. So I find that, in this case, conspiracy, which I find equates to jointly undertaken activity, leads us to the conclusion that probation has reached, which I agree with." (Dkt. 253 at 34.)

The district court's logic was tautological and completely contradicted by law. For the district court, the word "conspiracy" equates with "jointly undertaken activity," meaning that if a defendant is found guilty of participating in a conspiracy then no relevant conduct is necessary; they are automatically responsible for the conduct of everyone charged in that conspiracy. It is the charging document—not the evidence—that determines scope and reasonable foreseeability to the district court. But the Guidelines could not be more clear: "Because a count may be worded broadly and include the conduct of many participants over a period of time, the scope of the 'jointly undertaken criminal activity' is not necessarily the same as the scope of the

entire conspiracy, and hence relevant conduct is not necessarily the same for every participant." USSG § 1B1.3, cmt. n. 3(B).

That is exactly why this Court requires sentencing courts to be more exacting, so that on review this Court can determine whether the sentencing court actually applied the twin factors of scope and reasonable foreseeability or whether it erroneously equated the word "conspiracy" with "jointly undertaken activity," as it did here. *See Medina*, 485 F.3d at 1304 (finding clear error where the district court did not make sufficient factual findings supporting the loss attributable to the defendants that would allow for meaningful review on appeal). In *Hunter*, for example, this Court vacated the judgment and remanded for resentencing where the district court made generic findings like the ones here, that simply because was convicted of participating in a conspiracy, he should be accountable for the acts of all members. *Hunter*, 323 F.3d at 1319-20. Any view that a defendant is liable for the acts of codefendants just because he is found guilty of conspiracy "is at odds with the Sentencing Guidelines." *Id.* "[T]he Guidelines establish that the fact that the defendant knows about the larger operation, and has agreed to perform a particular act, does not amount to acquiescence in the acts of the criminal enterprise as a whole." *Id.*

The district court here failed to make any individualized findings as to scope and reasonable foreseeability. Had it simply said nothing on the record, then arguably

28

this Court would give a pass if the record otherwise supported the generic finding. *See, e.g., United States v. Crosby*, No. 23-10283, *9 (11th Cir. Jan. 3, 2024) ("Although the court did not make individualized findings [regarding relevant conduct] at sentencing, as it should have, the record supports holding Crosby responsible for this loss amount."). Here, the district court revealed that it based on loss on an erroneous legal assumption, that conspiracy equals jointly undertaken activity and that it need finding nothing more than the defendant's participation in a conspiracy to hold him accountable for the loss of everyone in that conspiracy. This was legal error, and this Court should remand.

## C. <u>The District Court Failed to Give Proper Weight to a § 3553(a) Factor—the Need to Avoid Unwarranted Sentencing Disparities.</u>

The district court further erred by, after calculating the Guidelines range, not appropriately considering "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." *See* 18 U.S.C. § 3553(a)(7). Appellant raised this squarely in front of the court at sentencing and in his sentencing memorandum. (Dkt. 253 at 70-74; *see also* Dkt. 231 at 17-20.)

Both the district court and the government took wildly different theories on both loss and reasonableness of sentence when comparing Appellant—who was far less culpable by comparison than his codefendants, as shown by their respective loss

amounts below—and the five defendants sentenced before him. The chart below reflects the sentence each defendant was given (Columns B and C); the total amount of the defendant's sentence (Column D); the amount of restitution ordered, which often tracks the loss amount in cases like this (Column E); and the amount of loss the government traced back to that individual's direct involvement during its investigation (Column F).[2]

| A Defendant | B Sent. § 1029 | C Sent. § 1028A | D Total Sentence | E Restitution | F Loss By This Defendant |
|---|---|---|---|---|---|
| T. Ly | 57 mo. | 24 mo. | 81 mo. | $2,833,928.78 | $2,300,402 (Dkt. 231-5) |
| T. Bah | 12 mo. | 24 mo. | 36 mo. | $376,829.90 | $375,162.48 (Dkt. 231-6) |
| A. Bah | 16 mo. | 24 mo. | 40 mo. | $759,203.87 | $759,184.68 (Dkt. 231-7) |
| O. Diallo | 12 mo. | 24 mo. | 36 mo. | $362,609.51 | $368,482.40 (Dkt. 231-8) |
| S. Bestman | 30 mo. | 24 mo. | 54 mo. | $252,127.21 | $253,127.21 (Dkt. 231-9) |
| **Appellant** | **21 mo.** | **48 mo.** | **69 mo.** | **$539,121.79[3]** | **$117,261.98[4]** |

While the numbers in Columns E and F vary slightly for certain defendants, what is clear is that the government sought to hold each defendant responsible only

---

[2] Codefendant's judgments are Docket Entries 203, 207, 208, 218, and 222.

[3] Dkt. 247.

[4] PSR ¶ 25.

for the transactions in which they had a direct or supervisory participation role (the latter applying only to Mr. Ly). By contrast, both the government and the court held Appellant—who was responsible for the *least* amount of loss and whose loss is *half* that attributable to the next most culpable defendant—accountable for the loss of the entire bunch.

The government justified this discrepancy because it claimed Appellant went to trial and it therefore had to prove his connection with the others. (Dkt. 253 at 32.) The district court adopted this reasoning. (*Id.*) But to the extent the government and district court believed a trial penalty was appropriate, Appellant lost (without dispute) the credit for accepting responsibility that his codefendants enjoyed. It remains true, as Appellant argued below, that the Guideline calculations must be accurate based on the facts and the law, not whether the government had to go through the effort of trial. (*Id.* at 32-24.) If the government and court wanted to reward a defendant for pleading guilty then it should have done so by variance, not by manufacturing facts and twisting the Guidelines. Indeed, the Guidelines Manual suggests that it is through USSG § 3E1.1 alone that the Guidelines may be adjusted to acknowledge whether a defendant accepted responsibility or chose instead to put the government to its burden should be weighed. For example, USSG § 5K2.0(d)(2) makes it clear that a defendant's acceptance of responsibility "may be taken into account **only** under § 3E1.1.

31

(emphasis added). What a court may *not* do is manipulate other guidelines—such as loss amount and relevant conduct—to reflect the fact that this defendant chose to go to trial and the other defendants accepted responsibility. If the court wanted to reflect that difference through a variance—for example, through a "warranted" sentence disparity—it could certainly do so. *See* 18 U.S.C. 3553(a)(7). But that's not what this court did, instead adopting the government's dueling theories on loss and relevant conduct for the one defendant who went to trial versus his five codefendants who pled guilty. Simply put, it's just unfair.[5]

Second, the connection on which the government seeks to rely (use of the same membership cards and credit cards) has been known to the government since early 2021 when the agent's reports of investigation (included in the Appellant's Appendix as Dkts. 231-5 through 231-9) were created. It was by choice alone that the government did not have to prove this connection regarding the other defendants at their

---

[5] To the extent the government argues that Appellant was convicted of the conspiracy while the other defendants were allowed to plead only to substantive counts of §§ 1029 and 1028A, that response does not offer the consistency the government seeks. Relevant conduct either applies or it does not, regardless of whether a conspiracy is proven at trial or even charged. *See* USSG § 1B1.3(a)(1)(B) ("[I]n the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, **whether or not charged as a conspiracy**. . . ) (emphasis added). Surely the government does not taking the position that only Appellant—the least culpable of all the defendants—knew they were all in a conspiracy together and could therefore reasonably foresee the actions of others.

32

sentencing hearing—if they were part of a jointly-undertaken criminal enterprise with Appellant, as the government argued at his hearing, then the government should have argued that those defendants were also responsible for the full loss. Further, every defendant except Mr. Bestman was sentenced after Appellant's trial, and so any evidence used against Appellant was presentation-ready at least by that time.

Appellant raised the sentencing disparity issue, but the district court never explained why this disparity was justified. Although the district court stated that it considered the § 3553(a) factors, it did not address at all why it created such a disparity between Appellant and his codefendants.[6] At the very least, the district court should have articulated why the sentence disparity—and the court's disparate treatment of the defendants—was warranted under the statute.

---

[6] The district court recited the magic words that it "consider[ed] all of the applicable sentencing factors pursuant to 18 U.S.C. Section 3553(a)," and that it found that the sentence "should provide sufficient punishment and adequate deterrence." (Dkt. 253 at 80.) It said nothing more on the factors, not even mentioning the need to avoid unwarranted sentence disparities, which was the bulk of Appellant's sentencing argument. Appellant recognizes that this mechanical recitation of those words is typically sufficient in this Circuit. *See Gonzalez*, 550 F.3d at 1324. However, when the gross disparity was the single biggest issue raised at the sentencing hearing and the court did not even attempt to explain why its disparate treatment of this defendant who was less culpable than his codefendants was justified, Appellant contends that the district court abused its discretion by not explaining why its sentence was fair.

II.    **The District Court Erred in Ordering Appellant to Pay $539,121.79 in Restitution.**

Because Appellant was convicted of a crime against property, he concedes that the district court was obligated to order restitution under the Mandatory Victim Restitution Act ("MVRA"). *See* 18 U.S.C. § 3663A. Much of Appellant's argument regarding loss amount is applies to his challenge to the restitution order as well and he will not repeat here the arguments above other than to say that he should only be ordered to pay restitution for the fraud directly attributable to him or that the government proved was reasonably foreseeable to him.

The government bears the burden of proving, as accurately as the evidence allows, the loss actually sustained by victims. *See United States v. Sheffield*, 939 F.3d 1274, 1277 (11th Cir. 2019). Restitution is not to be considered punishment but must be based on the specific loss that can be attributed to the defendant's conduct if the data allows such precision. *See id.* at 1277-78. The government must demonstrate exactly how any victim was "directly harmed by the defendant's conduct in the course of the scheme, conspiracy, or pattern." *See* 18 U.S.C. § 3663A(a)(2).

The inconsistency in the district court's restitution orders bears out when comparing Appellant's sum to the others. Four of the five other defendants were ordered to pay restitution jointly and severally with the remaining defendants; defendant Sayon Bestman's restitution lists him alone as the payor with no joint and several

34

liability. (*Compare* Dkt. 155 at 6 *with* Dkt. 207 at 6, Dkt. 208 at 6, Dkt. 218 at 6, and Dkt. 222 at 6.) While the district court did not hold any defendant other than Appellant accountable for losses sustained by other defendants, it did determine that most other defendants should pay their restitution jointly and severally with the codefendants. Again, the defendants were in a jointly undertaken activity where their activity was reasonably foreseeable to each other—or, they were not. The district court's rulings will create an administrative nightmare for the clerk of court in determining how to mete out any restitution payments under the various joint-and-several arrangements when each defendant is only required to make restitution for the losses they individually caused—with the exception of Appellant. And at the very least, because the district court ordered that Mr. Bestman is solely responsible for his restitution obligation, any amount included in Appellant's restitution total that overlaps with Mr. Bestman's restitution obligation should have been deducted.

## Conclusion

Because the district court committed procedural error in calculating Appellant's Guideline range, failed to consider the need to avoid unwarranted sentence disparities (or at least failed to articulate the basis for the disparity if the judge found it warranted), and failed to limit Appellant's restitution obligation to the losses he sustained, this Court should remand for resentencing.

35

Respectfully submitted,

**_s/ Lynsey M. Barron_**
Lynsey M. Barron

*Attorney for Appellant Abdoulaye Barry*

<u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the applicable type-volume limitation under Rule 32(a)(7) of the Federal Rules of Appellate Procedure and 11th Circuit Rule 32-4. According to the word count in Microsoft Word 2010, the relevant parts of this brief contain 8,401 words. This brief complies with the applicable type-style requirements limitation under Rule 32 of the Federal Rules of Appellate Procedure. I prepared this brief in a proportionally spaced Goudy Old Style 14-point font or, for headings, with a larger point size.

*s/ Lynsey M. Barron*

Lynsey M. Barron

*Attorney for Appellant Abdoulaye Barry*

## CERTIFICATE OF SERVICE

On January 5, 2024, I e-filed this brief with the Court via CM-ECF, which will serve all attorneys of record. On the same day, I mailed four copies to the Court via First Class United States Mail, postage prepaid.


*s/ **Lynsey M. Barron***
*Lynsey M. Barron*

*Attorney for Appellant Abdoulaye Barry*

38